UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
ASHLEY A. RODRIGUEZ,                                          :

                          Plaintiff,               :          11 Civ. 6977 (PAC) (DF)

      -against-                                          :          **REPORT AND**
                                                        **RECOMMENDATION**
MICHAEL J. ASTRUE,                                           :
Commissioner of Social Security,
                                         :

                        Defendant.                :
-------------------------------------------------------------X

**TO THE HONORABLE PAUL A CROTTY, U.S.D.J.:**

In this action, plaintiff Ashley A. Rodriguez ("Plaintiff") seeks review of the final

decision of Administrative Law Judge Glenn G. Meyers (the "ALJ") in favor of defendant,

Michael J. Astrue, the then-Commissioner of Social Security ("Commissioner" or

"Defendant"),[1] denying Plaintiff's application for disability insurance benefits. Defendant

moved, and Plaintiff cross-moved, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings. For the reasons set forth below, I respectfully

recommend granting Defendant's motion for judgment on the pleadings (Dkt. 8) and denying

Plaintiff's cross-motion (Dkt. 10).

---

    [1] Although Defendant's counsel has not so notified the Court, it is this Court's
understanding that Michael J. Astrue no longer holds the position of Commissioner of Social
Security, and that, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner.
Counsel for Defendant is directed to inform the Court whether the caption of this matter should
therefore be modified, and, if so, how it should now read.

## BACKGROUND[2]

### A.    Plaintiff's Personal Background

Plaintiff was born on January 9, 1985, has a high school education, and completed two
years of college. (R. 127, 131.)  From sometime in 1999 through June of 2009, Plaintiff
performed a variety of jobs, including retail jobs as a customer relations clerk, a cashier, and a
storage associate, as well as jobs as a school proctor and a school data entry assistant. (*Id.* at
127, 155-60.)  With the exception of Plaintiff's data-entry job, all of this past work required
constant or frequent standing and/or walking. (*See id.* at 156-61.)  On June 29, 2009, though,
while working as a storage associate, Plaintiff injured her back as she was helping a customer lift
a 75-pound box. (*Id.* at 31.)  As a result of this injury, Plaintiff ceased employment on that date,
alleging the onset of a disability caused by bulging discs in her lower back and a pinched nerve.
(*Id.*; *see also id.* at 126.)

Plaintiff described her activities of daily living both in her testimony before the ALJ (*see
generally id.* at 28-36) and in a form that she apparently filled out in connection with her
application for benefits (*see id.* at 135-39).  According to Plaintiff, she lived in an apartment with
her husband, two children, and an uncle. (*Id.* at 28.)  She explained that, although she attempted
to help out with the children, a second uncle frequently came by (between 7:00 a.m. and 6:00
p.m.) to help feed and dress the children. (*Id.* at 28, 31; *see also id.* at 135.)  Plaintiff described
her daily activities as including attending physical therapy, spending time with her children,

---

[2] The background facts set forth herein are taken from the administrative record (referred
to herein as "R."), which includes, *inter alia*, Plaintiff's medical records and the transcript of the
March 16, 2011 hearing held before the ALJ, at which Plaintiff testified.  These facts are
similarly summarized in Defendant's motion (*see* Dkt. 9), and Plaintiff does not dispute
Defendant's characterization of the evidence (*see* Dkt. 11).

sleeping, working at home on her computer, and reading magazines and books, while lying down. (*Id*. at 34-36.) She stated that she was able to make herself coffee, cook simple meals, and do light grocery shopping two to three times per month. (*Id*. at 36; *see also id*., at 136, 138.) She also reported, however, that she needed help to perform household chores like laundry and cleaning. (*See id*. at 137.) In describing her physical "routine," Plaintiff stated that she would typically sit for 10 to 15 minutes, that she would then stand and walk around, and that she would then return to sitting. (*Id*. at 35.) She claimed difficulty climbing stairs, reaching for things, lifting heavy weight, and sitting, standing, or walking for too long a period of time. (*Id*. at 139.)

### B.   Medical Evidence

As noted above, Plaintiff claims to have become disabled as of June 29, 2009, as the result of an accident. On July 10, 2009, Plaintiff had a consultation with a neurologist, Dr. R. C. Krishna. (*Id*. at 216.) At that time, Plaintiff reported that she had been lifting heavy boxes when she felt a sharp pain in her back (*id*.), and that she was taken to the Emergency Room at St. Vincent's Hospital (*id*.). Plaintiff complained to Dr. Krishna of "persistent lower back pain and stiffness radiating into the buttocks (left greater than right)." (*Id*.) She generally rated her pain as "7/10," and also described "numbness and tingling" and "difficulties lifting, bending, going up and down stairs, [and] pushing and pulling." (*Id*.)

Dr. Krishna examined Plaintiff, finding, in relevant part, "[n]ormal power bulk and tone in all muscle groups except for the weakness on the left lower extremity" (a weakness characterized by the doctor as a "4/5") and a "positive straight leg raise on the left side." (*Id*. at 217.) In addition, Dr. Krishna recorded specific findings for both strength testing of Plaintiff's lower extremities and range-of-motion testing for her lumbosacral spine, finding abnormalities in both areas. (*Id*. at 218.) In each of the five separate tests performed to measure her lower-

3

extremity strength (iliopsoas,[3] knee flexors, knee extensors, ankle extensors, and ankle flexors),

Plaintiff scored a normal "5/5" for her right leg and foot, but only a "4/5" for her left. (*Id.*)

On each of the six tests used to measure the range of motion of her lumbosacral spine, Plaintiff

showed a restriction in movement, as follows: (1) flexion – 50 degrees (60 being normal);

(2) extension – 10 degrees (25 being normal); (3) right lateral flexion – 10 degrees (25 being

normal); (4) left lateral flexion – 10 degrees (25 being normal); (5) right rotation – 15 degrees

(30 being normal); and (6) left rotation – 15 degrees (30 being normal). (*Id.*)

Based on this examination, Dr. Krishna's impression was that Plaintiff's "clinical

features [were] suggestive [of] underlying disc pathology resulting in radiculopathy." (*Id.*)

Dr. Krishna recommended an MRI and an EMG/NCV of the lower extremities, as well as

physical therapy three times per week, and a follow-up visit in four weeks. (*Id.*)  With respect to

Plaintiff's disability, Dr. Krishna opined that Plaintiff was "unable to work . . . due to the fact

that she [could not] sit for long periods." (*Id.* at 219.)  The doctor further stated that Plaintiff

"should avoid bending, twisting, lifting, climbing stairs, operating heavy machinery, [and]

prolonged sitting and standing." (*Id.*)  Although Dr. Krishna stated that these limitations were

"temporary," he indicated that they were expected to last for "an unknown period of time" and

opined that, as of the time of the exam, Plaintiff was "totally disabled." (*Id.*)

On July 13, 2009, Plaintiff had an initial evaluation for physical therapy. (*Id.* at 253.)

On the evaluation form contained in the record, Plaintiff was recorded as being a 24-year-old

female complaining of localized tingling, numbness, spasms, difficulty of movement, and

weakness, secondary to a work-related injury. (*Id.*)  Her past medical history was recorded as

---

[3] The iliopsoas is "a muscle consisting of the iliacus and psoas major muscles." *See*
http://www.merriam-webster.com/medical/iliopsoas.

"none/unremarkable," although the therapist made a note that, in 2006, Plaintiff had undergone

arthroscopic surgery on her left knee. (*Id.*; *see also id.* at 197 (later consultant report noting knee

surgery).) In addition, the form – which contains a number of handwritten annotations, some of

which are not readily legible – appears to indicate that, *inter alia*, Plaintiff's muscle strength test

had produced a four out of five in all affected areas (*id.* at 253), that her neurological assessment

was positive for localized back pain (*id.*), and that her gait was "guarded" (*id.*). The therapist's

physical therapy notes, though, reflect that Plaintiff tolerated treatment well and that she was

instructed to continue a physical therapy program, with moist heat, electrical stimulation,

therapeutic exercises, and massage. (*Id.* at 252.) Plaintiff continued to undergo regular physical

therapy through June 21, 2010, and the notes indicate that Plaintiff continued to tolerate

treatment well. (*Id.* at 225-52.)

On August 6, 2009, Plaintiff underwent an MRI of her lumbar spine. (*Id.* at 256.)

Dr. Joseph Leadon conducted the examination. (*Id.*) Although certain of Dr. Leadon's findings

were normal, he found a disc at "S1-S2" that was "a variant of normal," and, at "L5-S1," he

found "a broad bulging disc [that] cause[d] slight spinal stenosis." (*Id.*)[4]

On May 6, 2010, Plaintiff, who was then pregnant, underwent a Cesarean section and

bilateral tubal ligation. (*Id.* at 181.) Plaintiff successfully gave birth to a baby boy. (*Id.* at 183.)

The records show that there were no complications and that Plaintiff tolerated the procedure

well. (*Id.* at 193.)

---

[4] The "S1-S5" is part of the sacral region, at the bottom of the spine, "located below the
lumbar spine, . . .[and] is a series of 5 bony segments fused together that create a
triangular-shaped bone that serves as the base of the spine and makes up part of the pelvis." *See*
http://www.spine-health.com/conditions/spine-anatomy/normal-spinal-anatomy. The "L5-S1" is
"the segment where the lumbar spine meets the sacral region." *Id.*

On July 29, 2010, Dr. Justin Fernando, a consultative physician, performed an orthopedic examination of Plaintiff at the request of the Division of Disability Determination. (*Id.* at 197.) Plaintiff again complained of lower back pain with radiation of pain to the left foot, as well as numbness of the left foot after standing for an extended period of time. (*Id.*) In describing Plaintiff's reported inability to work, Dr. Fernando wrote:

> In 06/09 while she was lifting a box, she felt back pain for the first time followed by radiation of pain to her left foot. She has had the problem ever since and it does not seem to go away. . . . [S]he has pain in her lower back, the left knee, and associated with it is also the numbness in the left foot, all of which interferes with her ability to work. So far, all the jobs that she has had required her to be standing throughout the working day. She cannot do it because of the pain problems. It does not appear that her pain problems had been adequately cared for because it does not appear that she has seen anyone specializing in management of back pain.

(*Id.*)

Dr. Fernando noted that Plaintiff showered and dressed herself every day (*id.* at 198), and that, at the time of the exam, she appeared to be in no acute distress (*id.*). He recorded Plaintiff's gait as "antalgic"[5] and associated with a "mild limp." (*Id.*) He also noted that Plaintiff was unable to walk on her heels or toes, and that her squat was "[a]bout 10% at best," but he observed that her station was normal, that she used no assistive device, that she needed no help in either changing for the exam or in getting on or off the examination table, and that she was able to rise from a chair without difficulty. (*Id.*) Dr. Fernando examined Plaintiffs hands (for fine motor activity); her cervical, thoracic, and lumbar spine; and her upper and lower extremities (*id.* at 198-99), and also reviewed an X-ray of Plaintiff's lumbosacral spine (*id.* at

---

[5] An "antalgic" gait is one that is "[i]ntended to avoid pain (as a position of the body which is not painful)." 1-A *Attorney's Dictionary of Medicine* § A-8013 (2009).

199).  Although the doctor did not find any abnormalities upon his exam (except, perhaps, with

respect to an "SLR [straight leg raise] test," for which he recorded "30 degrees right and 45

degrees left; in upright position, 90 degrees bilaterally" (*id.*)), he diagnosed Plaintiff, in relevant

part, as having had a "recent history of acute onset of lower back pain with radiation of

pain/radicular symptoms in her left lower extremity," and indicated that her prognosis was

"fair."  (*Id.*)

> In sum, Dr. Fernando wrote:

> > The claimant's symptoms and the demonstration of disk herniation
> > whether it has been shown by MRI or not is unclear.  It does not
> > appear that she has had any high definition radiological imaging of
> > her back, but she claims to have subjective symptoms of numbness
> > in the left foot especially on the outer aspect of the left foot
> > [which] could mean that she has some disk problems in he[r] lower
> > lumbosacral disk.  It is also equally true that she has brisk
> > reactions in the reflexes at both ankles and at both knees indicating
> > that the nerve room [sic] compression, if there is any, could not be
> > significant enough to cause clinical signs.  The very fact that she
> > has brisk reflexes at the ankles and at both knees is more likely to
> > exclude any significant nerve root compression by lumbar disk
> > herniation. It is also evident that the treatment of her pain has been
> > appalling.  Perhaps, she should be directed to someone managing
> > pain and the problems could be rectified.  Clinically, she has no
> > evidence whatsoever to indicate disk herniation or nerve room
> > [sic] compression in the lumbosacral area.

(*Id.* at 199-200.)[6]

Plaintiff's record was reviewed by State Agency Disability Analyst, K. Doane ("Doane")

on September 17, 2010.  (*Id.* at 202-07.)  In assessing Plaintiff's residual functional capacity,

Doane concluded that Plaintiff was able to perform "light work."  (*Id.* at 207.)  In reaching this

conclusion, Doane determined that Plaintiff could occasionally lift and/or carry 20 pounds, that

---

[6] From Dr. Fernando's remarks, as quoted above, it appears that he may not have had
access to Plaintiff's prior MRI results.

she could frequently lift and/or carry 10 pounds, that she could stand and/or walk for about six

hours in an eight-hour workday, that she could also sit for about six hours in an eight-hour

workday, and that she had no other limitations with respect to pushing and/or pulling. (*Id.* at

203.) Doane further determined that, while Plaintiff could not climb ladders, ropes, or scaffolds,

she could frequently balance and crouch, and could occasionally climb ramps or stairs, stoop,

kneel, and crawl. (*Id.* at 204.) Doane found that Plaintiff had no manipulative, visual,

communicative, or environmental limitations. (*Id.* at 204-05.)

On February 2, 2011, Dr. Krishna completed a medical assessment of Plaintiff's ability

to do work-related activities. (*Id.* at 213.) Dr. Krishna stated on the assessment form that

Plaintiff had exertional limitations. (*Id.*) In particular, and with reference to Plaintiff's "lumbar

disc herniation," "radiculopathy," and an "aggravated [left] knee," Dr. Krishna indicated that

Plaintiff was capable of occasionally lifting and/or carrying only 10 pounds, and frequently

lifting and/or carrying less than 10 pounds (for a third to two-thirds of a workday). (*Id.*)

Referring to the same physical conditions, Dr. Krishna also indicated that Plaintiff was only

capable of standing and/or walking for less than two hours during an eight-hour workday, and

that she "must periodically alternate sitting and standing to relieve pain or discomfort." (*Id.* at

214.) Dr. Krishna further noted that Plaintiff could not push and/or pull, due to the same stated

conditions. (*Id.*) Finally, Dr. Krishna wrote on the form that Plaintiff could not engage in

"repetitive bending/twisting activities." (*Id.*) Dr. Krishna reported that his findings were based

on both his physical examination of Plaintiff and the results of medical tests, including an MRI.

(*Id.* at 215.)

After the ALJ issued a ruling denying Plaintiff benefits, Plaintiff, on appeal, submitted

certain additional medical records (*see id.* at 178), including a number of separate worker

compensation reports that had apparently been prepared by Dr. Krishna, covering the period

from September 10, 2009 to April 13, 2011 (*id*. at 262, 263-69). In each of these reports,

Dr. Krishna provided a diagnosis of "lumbrosacral radiculopathy" (*id*. at 263-69), and, in most

of the reports, he also indicated that Plaintiff suffered from a "lumbar sprain injury" and a

"herniated disc, lumbar" (*see generally id*.). In these reports, Dr. Krishna consistently described

Plaintiff's disability status as "temporary total." (*Id*.)

### C.     Procedural History

#### 1.     Plaintiff's Application for Benefits

On June 10, 2010, Plaintiff filed an application for Disability Insurance Benefits, alleging

that she had been disabled since June 29, 2009. (*Id*. at 39.) The Social Security Administration

denied Plaintiff's application on September 28, 2010, finding that she was not disabled. (*Id*. at

46-49.) On October 4, 2010, Plaintiff requested a hearing before an administrative law judge.

(*Id*. at 54-55.)

#### 2.     The Administrative Hearing

An administrative hearing reviewing Plaintiff's claim was held on March 16, 2011,

before the ALJ. (*Id*. at 20-42.) As described above, Plaintiff appeared and testified, with her

attorney present. (*See supra* at Background, Sect. A; *see also* R. 28-36.)

The ALJ also took testimony from a Vocational Expert ("VE"), Donald Slive, to help

determine whether Plaintiff could perform her past relevant work and whether other jobs existed

in the national and local economy that Plaintiff would be able to perform. (*Id*. at 36.) The VE

identified Plaintiff's past relevant work as a "consumer relations clerk" (as classified under the

Dictionary of Occupational Titles ("DOT"), code number 241.367-014), and testified that this

position had a "sedentary" exertional level. (*Id*.) The ALJ, though, asked the VE to

> consider a person with the same work experience, the same age
> and the same academic vocational profile as that of [Plaintiff,]
> [and] whose maximum exertional capability is sedentary and who
> in addition must alternate from sitting to standing at will
> throughout the eight-hour workday.

(*Id.* at 37.) The ALJ asked the VE whether there were any jobs existing in the national economy

that a person with these characteristics could perform. (*Id.*) The VE opined that a person with

these characteristics would be unable to perform Plaintiff's previous work as a consumer

relations clerk (*id.* at 20, 37), but could perform jobs such as "document preparer" (which he

identified as DOT code 249.587-018) and "final assembler" (DOT code 713.687-018). (*Id.*)

According to the VE, 8,320 document-preparer jobs then existed in the national economy and

649 within the region, and 3,420 final-assembler jobs then existed in the national economy and

328 in the region. (*Id.*) The VE started to describe a third possible occupation for Plaintiff, but

the ALJ interrupted him, explaining that "[t]wo, two is sufficient for now." (*Id.*)

On April 8, 2011, the ALJ issued a written decision, denying Plaintiff's claim for

benefits. (*Id.* at 14-21.) As discussed in more detail below, the ALJ found that, while Plaintiff

suffered from impairments involving her left knee and back pain, she retained the residual

functional capacity to perform "sedentary" work, as defined in 20 C.F.R. § 404.1567(a), except

that she would be required to change from a sitting to a standing position, at will, throughout an

eight-hour workday. (*Id.* at 16-17.) Given these limitations, and in reliance on the VE's

testimony, the ALJ found that Plaintiff could not perform her past relevant work, but that –

considering Plaintiff's age, education, work experience, and residual functional capacity – jobs

existed in significant numbers in the national economy that she could perform. (*Id.* at 20.)

Accordingly, the ALJ concluded that Plaintiff "ha[d] not been under a disability, as defined in

10

the Social Security Act," from the date of onset of her claimed disability through the date of the

ALJ's decision.  (*Id.* at 21.)

The ALJ's decision became the final decision of the Commissioner when Plaintiff's

application for review was denied by the Appeals Council on September 13, 2011.  (*Id.* at 1-3.)

This action followed.

### 3.  <u>Motions Before This Court</u>

Currently before the Court are the parties' cross-motions for judgment on the pleadings.

In his moving papers, Defendant argues that the ALJ applied the correct legal standards and that

his decision was supported by substantial evidence in the record.  (*See* Memorandum of Law in

Support of Defendant's Motion for Judgment on the Pleadings, dated February 28, 2012 ("Def.

Mem.") (Dkt. 9), at 1.)  For her part, Plaintiff argues that the ALJ did not apply the correct legal

standards and that his decision was not supported by substantial evidence.  At bottom, though,

Plaintiff raises only a single challenge to the ALJ's decision:  she argues that the decision should

be reversed because the Commissioner failed to carry his burden of establishing that "significant

numbers" of jobs exist in the national economy that Plaintiff remained capable of performing.

(Memorandum of Law in Opposition to Defendant's Motion for Judgment on the Pleadings and

in Support of Plaintiff's Cross-Motion for Judgment on the Pleadings, dated March 26, 2012

("Pl. Mem.") (Dkt. 11), at 5-8.)

## DISCUSSION

### I.   APPLICABLE LEGAL STANDARDS

#### A.   Standard of Review

Judicial review of a decision of the Commissioner is limited.  The Commissioner's decision is final provided that the correct legal standards are applied and findings of fact are supported by substantial evidence.  42 U.S.C. § 405(g) (2006); *Shaw v. Carter*, 221 F.3d 126, 131 (2d Cir. 2000).  "Where an error of law has been made that might have affected the disposition of the case, this [C]ourt cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ."  *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984) (citations omitted).  Thus, the Court must first ensure that the ALJ applied the correct legal standards.  *See Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Johnson v. Bowen*, 817 F.2d 983, 986 (2d Cir. 1987).

The Court must then determine whether the Commissioner's decision is supported by substantial evidence.  *See Tejada*, 167 F.3d at 773.  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal citation and quotation marks omitted).  The Court must consider the record as a whole in making this determination, but it is not for this Court to decide *de novo* whether the plaintiff is disabled.  *See Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002) ("Where the Commissioner's decision rests on adequate findings supported by evidence having rational probative force, we will not substitute our judgment for that of the Commissioner."); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); *Beauvoir v. Chater*, 104 F.3d 1432, 1433 (2d Cir. 1997).  The Court will uphold the Commissioner's decision upon a finding of substantial evidence, even where contrary evidence exists.  *See Alston v. Sullivan*, 904

12

F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder."); *see also DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998) (affirming an ALJ decision where substantial evidence supported both sides).

### B.  The Five-Step Sequential Evaluation

To be entitled to benefits under the Act, a plaintiff must establish that he or she has a "disability." *See Balsamo v. Chater*, 142 F.3d 75, 79 (2d Cir. 1998).  The term "disability" is defined in the Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A); *Balsamo*, 142 F.3d at 79.  Moreover,

> [a]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B).

In evaluating a disability claim, the ALJ must follow the five-step procedure set out in the regulations governing the administration of Social Security benefits.  *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (per curiam).  First, the ALJ must determine whether the claimant is engaged in substantial gainful activity.  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If not, the second step requires the

13

ALJ to consider whether the claimant has a "severe" impairment or combination of impairments that significantly limit his or her physical or mental ability to do basic work activities. *Id.* §§ 404.1520(a)(4)(ii), (c), 416.920(a)(4)(ii), (c). If the claimant does suffer from such an impairment, then the third step requires the ALJ to determine whether this impairment meets or equals a listed impairment in Appendix 1 of the regulations. *Id.* §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant's impairment meets or equals one of those listed, then the claimant is presumed to be disabled "without considering [the claimant's] age, education, and work experience." *Id.* §§ 404.1520(a)(4)(iii), (d), 416.920(a)(4)(iii), (d). If the presumption does not apply, then the fourth step requires the ALJ to determine whether the claimant is able to perform his or her "past relevant work." *Id.* §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv). Finally, if the claimant is unable to perform his or her past relevant work, the fifth step requires the ALJ to determine whether the claimant is capable of performing "any other work" that exists in the national economy. *Id.* §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g).

In making a determination pursuant to the process discussed above, the ALJ must consider four sources of evidence: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." *Brown v. Apfel*, 174 F.3d 59, 62 (2d Cir. 1999) (internal citations and quotation marks omitted).

Under the procedure set out in the governing regulations, "[t]he claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment." *Berry*, 675 F.2d at 467 (internal citation omitted). Once it has been determined that the claimant cannot perform his or her past relevant employment, the burden shifts to the Commissioner to "show that there is work in the national economy that the claimant can do."

14

*Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009). The Commissioner "need not provide additional evidence of the claimant's residual functional capacity." *Id.* Rather, the Commissioner need only "use the same residual functional capacity assessment" that the Commissioner used to determine whether the claimant could perform past relevant work. 20 C.F.R. § 404.1560(c)(2). The Commissioner, however, must prove that the alternative work "exists in significant numbers in the national economy" and that the claimant can perform this work, given the claimant's residual functional capacity and vocational factors. *Id.*

Where the claimant suffers only from exertional impairments, the Commissioner satisfies his burden by referring to the applicable Medical-Vocational Guidelines (the "Grid"), 20 C.F.R. Pt. 404, Subpt. P, App. 2 (1986). Where the "claimant suffers from additional nonexertional impairments, the grid rules may not be controlling" and the Commissioner may need to seek additional evidence, such as expert testimony. *Bapp v. Bowen*, 802 F.2d 601, 604-05 (2d Cir. 1986) (citing 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(e)(2)(1986)).

## II.   REVIEW OF THE ALJ'S DECISION

### A.   The ALJ's Decision

In his April 11, 2011 decision, after reviewing the evidence under the five-step sequential evaluation procedure set out in the Commissioner's regulations, the ALJ concluded that Plaintiff was not disabled under the Act and, therefore, denied Plaintiff's request for disability insurance benefits. (R. 14-21.) At the first step, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since June 29, 2009, the alleged onset date of her claimed disability. (*Id.* at 16; *see* 20 C.F.R. § 404.1520(a)(4)(i).) At step two, the ALJ found that Plaintiff had "severe" impairments based on Plaintiff's history of torn cartilage in the left knee and back pain (described by the ALJ as relating to a "transitional L5 vertebral body"), and on the fact that the

15

symptoms from these impairments had more than a minimal effect on Plaintiff's ability to perform work functions on a sustained basis.  (R. 16; *see* 20 C.F.R. § 404.1520(a)(4)(ii).)  At the third step, the ALJ found, after a review of several, possibly relevant, listed impairments, that Plaintiff's severe impairments, either singly or in combination, were not so severe as to meet or medically equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (R. 16-17; *see* 20 C.F.R. § 404.1520(a)(4)(iii).)

In connection with proceeding to the fourth step, the ALJ found that Plaintiff had the residual functional capacity to perform the full range of sedentary work as defined in 20 C.F.R. § 404.1567(a), except that Plaintiff needed to be able to shift from sitting to standing positions throughout her workday.  (R. 17; *see* 20 C.F.R. § 404.1567(a).)  At step four, the ALJ found that, with the identified limitations, Plaintiff was unable to perform her past relevant work as a consumer relations clerk.  (R. 17-20; *see* 20 C.F.R. § 404.1520(a)(4)(iv).)  In making this determination, the ALJ considered, in detail, the medical evidence of record, and also relied on the testimony of the VE.  (R. 20.)

Finally, at step five, the ALJ noted that, if Plaintiff had been assessed with the residual functional capacity to perform the full range of sedentary work, then a finding of "not disabled" would have been directed by the Grid.  (*Id.*)  Given, however, that Plaintiff had the additional impairment of needing to change from sitting to standing at will throughout an eight-hour workday, the ALJ looked beyond the Grid, and also considered the VE's testimony in determining whether Plaintiff was "disabled."  (*Id.* at 20-21.)

The ALJ pointed out that, at the hearing, he had asked the VE whether jobs existed in the national economy for an individual with Plaintiff's age, education, work experience, and residual functional capacity (*id.* at 21), and that the ALJ had identified two such occupations, both of

16

which were sedentary and unskilled in nature (*id.*; *see also id.* at 37).  As to the first of these jobs ("document preparer"), the VE had testified that there were 8,320 such jobs in the national economy, and 649 jobs in the region, and, as to the second ("final assembler"), the VE had testified that there were 3,420 jobs in the national economy and 328 in the region.  (*Id.* at 21, 39.)  Based on this testimony, which the ALJ concluded was consistent with the information contained in the Dictionary of Occupational Titles, and upon consideration of Plaintiff's age, education, work experience, and residual functional capacity, the ALJ determined that Plaintiff was "capable of making a successful adjustment to other work that exists in 'significant numbers' in the national economy."  (*Id.* at 21; *see* 20 C.F.R. § 404.1520(a)(4)(v).)  As a result, the ALJ found that Plaintiff was "not disabled" under the Act.  (R. 21.)

As the ALJ followed the five-step evaluation procedure set forth in the Social Security regulations, this Court's review is limited to determining whether, in the course of following that procedure, the ALJ correctly applied the relevant legal principles, and whether his decision was supported by substantial evidence.  *See Shaw*, 221 F.3d at 131.  In this case, Plaintiff particularly challenges only one aspect of the the ALJ's decision, *i.e.*, his determination at step five that the type of work that Plaintiff retained the capacity to perform existed in "significant" numbers in the national economy.  For the reasons set out below, this Court concludes that, in making that determination, the ALJ correctly applied the relevant legal principles, and that the ALJ's decision was supported by substantial evidence.

### B. The ALJ's Determination That Work Existed in "Significant Numbers" in the National Economy

Plaintiff argues that the Commissioner had a burden, at step five, to prove that there was "work which exist[ed] in significant numbers in the national and local economy" that Plaintiff

was capable of performing, and that he failed to sustain that burden. (*See* Pl. Mem., at 7.) Plaintiff does not challenge the ALJ's determination of the scope of Plaintiff's residual functional capacity (R. 17-20), or the ALJ's determination that Plaintiff was capable of performing the particular jobs that the VE identified in his testimony (*id.* at 20). Rather, Plaintiff contends that, because the VE identified fewer than 1,000 jobs in Plaintiff's region, and fewer than 12,000 jobs nationwide that Plaintiff would be capable of performing (numbers which, Plaintiff argues, represent only a small percentage of the total number of jobs in the workforce), the ALJ had an insufficient basis to find that the number of jobs that Plaintiff could perform was "significant." (*See* Pl. Mem., at 7.) The applicable case law, however, does not support Plaintiff's argument on this point.

Where a claimant is unable to perform her relevant past work, the ALJ must determine, at step five, whether the claimant is capable of performing "any other work" that exists in the national economy. 20 C.F.R. §§ 404.1520(a)(4)(v), (g), 416.920(a)(4)(v), (g); *see Henry v. Astrue*, No. 07 Civ. 0957 (WCC), 2008 WL 5330523, at *10 (S.D.N.Y. Dec. 17, 2008 (noting that the Social Security Act only provides benefits to claimants "who cannot engage in *any* other kind of substantial gainful work which exists in the national economy" (internal quotation marks and citation omitted)). As set out above, it is the Commissioner's burden to show that such alternative work exists "in significant numbers" in the national economy. 20 C.F.R. § 404.1560(c)(2). The testimony of a vocational expert can satisfy this burden. *See Bapp*, 802 F.2d at 604-05; *Henry*, 2008 WL 5330523, at *9.

As the Social Security Act does not specify precisely what constitutes a "significant number," this determination must be made by courts on a case-by-case basis, and there is no specific number that marks the line between "significant" and "insignificant." *See, e.g., Henry*,

2008 WL 5330523, at *10. Both the regulations and case law make clear, however, that it is the number of existing *job positions*, and not the number of occupations, that the ALJ must consider in deciding whether there is a significant number of jobs. *See* 20 C.F.R. § 404.1566(b); *Sullivan v. Astrue*, No. 08-CV-6355 (CJS), 2009 WL 1347035, at *15 n.15 (W.D.N.Y. May 13, 2009) ("Even if the VE had identified only one job that existed in sufficient numbers, the Commissioner would have met his burden at the fifth step." (citing *Bull v. Commissioner of Social Sec.*, No. 1:05-CV-1232 (LEK/RFT), 2009 WL 799966, at *6 (N.D.N.Y. Mar. 25, 2009))); *Henry*, 2008 WL 5330523, at *10 (noting that it is the number of actual positions, not types of jobs, that is relevant under step five); *see also Dumas v. Schweiker*, 712 F.2d 1545, 1553 (2d Cir. 1983) (affirming step-five determination where ALJ only pointed to one type of job).

Further, while a court may consider whether the jobs in the national economy that the claimant could perform represents a large or small percentage of the country's total workforce, *see Walker v. Shalala*, No. H-93-2507, 1994 WL 171209, at *3 (S.D. Tex. Jan. 6 1994) (noting that number of jobs was not significant when considered as a percentage of the work force); *Leonard v. Heckler*, 582 F. Supp. 389, 391 (M.D. Penn. 1983) (noting that 4,000-5,000 jobs nationally was small fraction of national workforce), it remains the "number" of existing jobs that ultimately matters, not the "percentage" of the workforce that such a number represents, *see Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) ("In defining disability within the meaning of the Act, Congress spoke in terms of numbers, not of percentages." (citing 42 U.S.C. § 423(d)(2)(A))); *Daniels v. Apfel*, 92 F. Supp. 2d 1269, 1283 (S.D. Ala. 2000) (same).

Also, although the key question for the ALJ is whether a significant number of jobs exists in the *national* economy, the regulations expressly provide that "[w]ork exists in the national economy when it exists in significant numbers *either* in the region where [the claimant] lives *or*

19

in several other regions of the country." 20 C.F.R. § 404.1566(a) (emphasis added); *see Bull*, 2009 WL 799966, at *6 (noting this, and quoting 20 C.F.R. § 404.1566(a)). Accordingly, it is permissible for an ALJ to look solely to evidence regarding the number of jobs that exist locally, to answer the question of whether sufficient jobs exist nationally.

As a survey of the case law reveals, "[c]ourts have generally held that what constitutes a 'significant' number is fairly minimal." *Fox v. Comm'r of Soc. Sec.*, No. 6:02–CV–1160, 2009 WL 367628, at *20 (N.D.N.Y. Feb.13, 2009). Indeed, numerous courts have held that numbers of regional jobs that might seem rather small, when compared to a total workforce, can still be sufficient to constitute the "significant" number of jobs that the law requires. *See, e.g., Henry*, 2008 WL 5330523, at *10 (finding that 1,208 jobs in the local economy constituted a significant number); *Brooks v. Barnhart*, 133 Fed. App'x 669, 671 (11th Cir. 2005) (finding 840 polisher, documenter, and bonder jobs in the regional economy to be a significant number); *Trimiar v. Sullivan*, 966 F.2d 1326, 1330-32 (10th Cir. 1992) (finding that 650-900 potential jobs statewide constituted a sufficient number of jobs); *Nix v. Sullivan*, 744 F. Supp. 855, 863 (N.D. Ind. 1990) (finding 675 regional jobs to be a significant number), *aff'd*, 936 F.2d 575 (7th Cir. 1991); *Jenkins v. Bowen*, 861 F.2d 1083, 1087 (8th Cir. 1988) (finding 500 jobs in applicant's region to be a significant number); *Craigie v. Bowen*, 835 F.2d 56, 58 (3d Cir. 1987) (finding that 200 jobs in applicant's region constituted a clear indication of substantial jobs).

Here, the ALJ reasonably concluded that job positions that Plaintiff could hold existed in significant numbers in the national economy. At the hearing, the VE identified two job categories that an individual with Plaintiff's age, education, work experience, and residual functional capacity could perform (R. 37), and testified that about 11,740 jobs in those categories (combined) existed in the national economy, and about 977 existed in Plaintiff's region (*see id.*).

As can be seen from the cases cited above, the number of regionally-existing jobs that the VE identified is well within the range of job numbers that have been held to be "significant," and, in fact, are higher than some that have found to be sufficient under the governing law.  Given that, under the regulations, the ALJ would have been permitted to rely solely on regional numbers, the Court need not even reach the question of whether the separate "national" numbers cited by the VE were independently sufficient to satisfy the Commissioner's burden.[7]

The cases upon which Plaintiff relies do not dictate a different result, as they mainly turn on facts that are not analogous to those presented here, or on rules or issues that have not been raised in this case.  For example, in *Waters v. Sec'y of Health and Human Servs.*, 827 F. Supp. 446 (N. D. Mich. 1992) (cited in Pl. Mem., at 6), the court reversed the decision of an ALJ who had failed to take into account the fact that, of the 1,000 jobs in the state of Michigan that the plaintiff was found to be able to perform, most were isolated in a single region within the state, 500 miles from plaintiff's residence, *see Waters*, 827 F. Supp. at 449-50; *see also Walker*, 1994 WL 171209, at *2 (cited in Pl. Mem., at 6) (noting that "[i]solated jobs that exist only in very limited numbers in relatively few locations outside the region where you live are not considered 'work which exists in the national economy'" (internal quotation marks omitted)).  In this case, Plaintiff has made no contention that the nearly 1,000 regional jobs identified by the VE were

---

[7] Although not necessary for this analysis, the Court also notes that the hearing transcript, as quoted above (*see* Background Section (C)(2), *supra*), plainly shows that the ALJ interrupted the VE as he was about to list another job category in which Plaintiff would have been capable of working.  Thus, while the Court cannot speculate as to what the VE would have said, had he not been interrupted, the transcript would reasonably support the inference that the number of existing jobs that Plaintiff could have performed was actually larger than what the record specifically reflects.

actually inaccessible to her, based on the location of her residence.[8]  In another case cited by Plaintiff, the court was addressing an entirely different rule and requirement thereunder, which looked to the number of distinct occupations available, not individual jobs, as is the issue here. *See Lounsbury v. Barnhart*, 468 F.3d 1111, 1117 (9th Cir. 2006) (cited in Pl. Mem, at 6) (holding that only one occupation was insufficient to satisfy the requirement in Rule 202.00(c) that a "range of . . . work" be available).  Finally, in the last case cited by Plaintiff, the court ordered remand in order to clarify a vocational expert's equivocal testimony that there *might* have been 4,000 to 5,000 jobs in the nation capable of accommodating the claimant's need for a completely dust-free environment.  *See Leonard*, 582 F. Supp. at 391-92 (cited in Pl. Mem., at 6-7.).  In contrast, in the case before this Court, the VE provided unequivocal testimony that Plaintiff was capable of performing nearly 12,000 jobs that existed nationally – nearly three times the number of jobs that might have been within the plaintiff's functional capacity in *Leonard*.

In this case, where Plaintiff has raised only one challenge to the ALJ's decision, and where the ALJ's determination in that regard – *i.e.*, his finding that jobs that Plaintiff was capable of performing existed in "significant numbers" in the national economy – was supported by substantial evidence, the ALJ's determination, denying Plaintiff benefits, should not be disturbed.

---

[8] In any event, and despite the reasoning of the cases cited by Plaintiff, the law dictates that a claimant who cannot perform her previous work may only be considered to be disabled where she cannot "engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [s]he lives . . . ."  42 U.S.C. § 423(d)(2)(A).

22

## CONCLUSION

For the forgoing reasons, I respectfully recommend that the Court grant Defendant's motion for judgment on the pleadings (Dkt. 8) and deny Plaintiff's cross-motion (Dkt. 10).

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6. Such objections, and any responses to objections, shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable Paul A. Crotty, United States Courthouse, 500 Pearl Street, Room 735, New York, NY 10007, and to the chambers of the undersigned, United States Courthouse, 500 Pearl Street, Room 1660, New York, NY 10007. Any requests for an extension of time for filing objections should be directed to Judge Crotty. FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS WILL RESULT IN A WAIVER OF OBJECTIONS AND WILL PRECLUDE APPELLATE REVIEW. *See Thomas v. Arn,* 474 U.S. 140, 155 (1985); *IUE AFL-CIO Pension Fund v. Herrmann,* 9 F.3d 1049, 1054 (2d Cir. 1993); *Frank v. Johnson,* 968 F.2d 298, 300 (2d Cir. 1992); *Wesolek v. Canadair Ltd.,* 838 F.2d 55, 58 (2d Cir. 1988); *McCarthy v. Manson,* 714 F.2d 234, 237-38 (2d Cir. 1983).

Dated: New York, New York
      June 24, 2013

Respectfully submitted,

DEBRA FREEMAN
United States Magistrate Judge

23

Copies to:

Hon. Paul A. Crotty, U.S.D.J.

All counsel (via ECF)